Kimberly Ann BROUSSARD, by
her mother and next friend,
Ruth LORD, Plaintiff,

v.

SCHOOL BOARD OF THE CITY OF
NORFOLK, Michael J. Caprio, Cheryl
Artese, Cynthia Watson, and Gene R.
Carter, Defendants.

Civ. A. No. 2:92cv71.

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 3, 1992.

Stephen Barkai Pershing, ACLU Foundation of Virginia, Richmond, Va., Mary Guy Commander, Paul M. Lipkin, Goldblatt, Lipkin & Cohen, P.C., Norfolk, Va., for plaintiff.

Norman Allan Thomas, Harold Phillip Juren, Deputy City Attys., Philip Richard Trapani, City Atty., Office of City Atty., Norfolk, Va., for defendants.

## ORDER AND OPINION

DOUMAR, District Judge.

This action was brought pursuant to 42 U.S.C. § 1983 by a public school student of Blair Middle School in Norfolk, Virginia. The matter comes before the Court after a trial on plaintiff's assertions that school administrators violated her Fourteenth and First Amendment rights. Plaintiff, by her next friend, asserted that her suspension for refusing to change out of a shirt printed with the words "Drugs Suck!" violated her rights of due process and free speech. Plaintiff seeks declaratory and injunctive relief. The Court finds that plaintiff's one-day suspension for refusing to change out of her shirt did not violate her due process and free speech rights.

## I. PROCEDURAL HISTORY

In her complaint, plaintiff alleged that the defendants deprived her of her right to due process by suspending her summarily, without according her notice or an opportunity to be heard. She alleged a violation of her right of free speech because the Blair Middle School administrators prohibited her from wearing in school a T-shirt emblazoned with the words "Drugs Suck!" On February 19, 1992, defendants moved for summary judgment on the due process and the free speech issues.

On July 6, 1992, the Court denied defendants' motion for summary judgment without prejudice to its renewal. Between July 6 and July 8, 1992, a bench trial was held on the due process and First Amendment issues. At the conclusion of the trial, the defendants moved for judgment as a matter of law pursuant to Rule 52(b) of the Federal Rules of Civil Procedure. The Court granted judgment as a matter of law on the due process claim.

## II. FACTS

On March 31, 1991, Kimberly Broussard bought a concert T-shirt at a concert of a pop music group, New Kids on the Block. The shirt was black with white lettering. On the front of the shirt, printed in letters approximately eight inches in height, were the words "Drugs Suck!" On the back of the shirt was printed "NKOTB Donnie Wahlberg," referring to the group New Kids on the Block and its leader.

Kimberly, at the time a twelve-year-old in the seventh grade, wore the "Drugs Suck!" shirt to Blair Middle School on Wednesday, April 17, 1991. Blair Middle School is an urban school within the Norfolk Public School system consisting of the sixth, seventh, and eighth grades. Approximately 1200 students ranging in age from eleven to fifteen years attend the school.

At approximately 7:45 a.m. on April 17, 1991, three of Kimberly's teachers noticed her "Drugs Suck!" shirt while she was walking down the hallway before homeroom. Kimberly's Communication Skills teacher, Ms. Artese, told Kimberly that the shirt was inappropriate attire for school.

Ms. Artese took Kimberly to the school's main office and spoke with Ms. Watson, the school's dean of students. The Blair Middle School principal, Mr. Caprio, was not in the building at that time; therefore, Dr. Grant, the assistant principal, was in charge. Ms. Watson and Dr. Grant conferred, and both found the shirt inappropriate for school due to the offensiveness of the word "suck." They asked Kimberly whether she would wear the shirt inside out or whether she had another shirt or could borrow a shirt from another student. Kimberly responded that she would not turn her shirt inside out, did not have another shirt, and could not borrow a shirt from another student.

At 8:00 a.m., from Ms. Watson's Office, Kimberly telephoned her mother, Mrs. Ruth Lord, to ask if she or her stepfather could bring another shirt to school because the school found the word "suck" on Kimberly's shirt to be inappropriate for school. Mrs. Lord could not immediately leave home to bring a shirt, but she told Ms. Watson that she would send another shirt to the school when Kimberly's stepfather, Mr. William Lord, returned home. Mrs. Lord expressed concern that Kimberly not miss her classes.

Kimberly was sent back to homeroom with a pass to return to the office to see if the replacement shirt her mother promised to send had arrived. The shirt had not arrived by the end of homeroom and Kimberly was instructed to return to the office after each class to see if a replacement shirt had arrived. At 8:45, Mrs. Lord phoned Ms. Watson and assured her that she would send another shirt.

At 9:00 a.m., Mrs. Lord phoned Mr. Leo Williams, director of pupil personnel services for the Norfolk School System. Mrs. Lord informed him that the school had requested that Kimberly not wear the "Drugs Suck!" shirt, and she questioned whether the school could insist that Kimberly not wear the shirt to school because the administrators found it inappropriate. Mr. Williams told Mrs. Lord that he considered the shirt to be in bad taste, and Mrs. Lord testified that Mr. Williams said the

word had sexual connotations. Mr. Williams requested that she send a replacement shirt to school and persuade Kimberly not to wear the shirt.

Mrs. Lord testified that she had the impression that Mr. Williams had overruled the Blair Middle School administrators' decision that Kimberly could not wear the shirt to school. Mr. Williams, however, had no authority to prevent or overrule the imposition of disciplinary action before it took place. He had authority only to reverse a school administrator's decision after disciplinary action had occurred and a formal appeal had been taken to him.

Mrs. Lord called Ms. Watson at 10:00 a.m. and told her that Mr. Williams had overruled the school administrators' opinion that Kimberly could not attend class in the shirt. Nevertheless, Mrs. Lord again stated that she would send another shirt to school for Kimberly.

After the principal, Mr. Caprio, arrived at the school, Ms. Watson informed him of the situation and that Mrs. Lord had indicated that Mr. Williams had given Kimberly permission to wear the shirt in class. Mr. Caprio called Mr. Williams, who denied that he had said that Kimberly could wear the shirt to class. Mr. Williams indicated that he would call Mrs. Lord to explain that he had not given permission to wear the shirt to class.

At 10:45 a.m., Kimberly telephoned her mother from the office. Mrs. Lord told Kimberly that Mr. Williams had said she could wear her "Drugs Suck!" shirt to class. Kimberly told her mother that she had decided not to change her shirt. Mrs. Lord then spoke to Ms. Watson and informed her that Kimberly would not change the shirt.

At noon, Mr. Williams phoned Mrs. Lord to tell her that he had spoken to the Blair Middle School administrators and that she had misrepresented his statements when she spoke to Ms. Watson. Mr. Lord had returned home sometime before this second conversation with Mr. Williams, listened in on it, and went to the school with another shirt for Kimberly. It is uncontroverted that, through this point in time, no mention had been made that Kimberly could be suspended for wearing the shirt.

Mr. Lord arrived at the school's main office between noon and 1:00 p.m. Mr. Lord spoke with Mr. Caprio in Kimberly's presence. Mr. Caprio showed them the school disciplinary rules in the student pamphlet, "4 R's—Rules, Rights, Regulations and Responsibilities." Mr. Caprio expressed his distaste for the shirt's language and told them that Kimberly had violated Rule One. Rule One states that a student does not have a right to engage in conduct that will cause a disruption, disturb, or interrupt any school activity. The pamphlet lists as an example of a Rule One violation the wearing of clothing that distracts other students or that interferes with the classroom participation of other students. Mr. Lord disputed Mr. Caprio's ruling that the wearing of the shirt violated Rule One.

Mr. Caprio gave Mr. Lord and Kimberly the options of changing out of the "Drugs Suck!" shirt and into appropriate attire and thereupon returning to class or of going home for the remainder of the day. In protest, Mr. Lord wrote on an index card, which he left with the school officials, that Mr. Williams had determined that Kimberly had the option to decide whether to wear the shirt. He also wrote that the shirt did not violate the dress code guideline.

Mr. Caprio told Mr. Lord and Kimberly that, if she refused to change the shirt and remained in school that day, she would be disciplined with suspension. Mr. Lord and Kimberly had the impression that she was suspended if she did not change the shirt, even if she went home for the remainder of the day.

Kimberly decided not to change the shirt. The school's office manager released Kimberly from school into the care of her stepfather. Mr. Lord and Kimberly left the school believing that she was suspended. Kimberly testified that she and her stepfather took the pamphlet home and later read about the process for the appeal of school discipline.

In the afternoon, Mrs. Lord phoned Ms. Watson to inquire whether Kimberly had been suspended and, if so, whether a sus-

pension notice had been issued. A suspension notice had not been prepared, and Ms. Watson told Mrs. Lord that Kimberly had not been suspended. Mrs. Lord indicated that Kimberly would return to school wearing the "Drugs Suck!" shirt. Ms. Watson said that, in that case, she was suspended. Mrs. Lord told Ms. Watson that she would return to school to obtain a suspension notice.

When Mrs. Lord arrived at the school, Mr. Caprio handed her the notice stating that Kimberly was suspended for one day. The notice stated that Kimberly

refus[ed] a request by the principal to remove a shirt that was inappropriate. Parent requested a formal suspension notice instead of the option chosen by father to take the child home. Parent must appear for reinstatement on April 19, 1991.

Upon receipt of the notice, Mrs. Lord indicated to Mr. Caprio that he would hear from the American Civil Liberties Union ("ACLU").

After the issuance of the suspension notice, Mr. Lord phoned Mr. Sellew, then the deputy superintendent of schools. Mr. Sellew told Mr. Lord that the shirt was inappropriate because of the offensiveness and sexual connotation of the word "suck." That afternoon, Mr. Lord also phoned Dr. Carter, the superintendent of Norfolk public schools.

The next day, April 18, 1991, Mr. and Mrs. Lord wrote to Dr. Carter requesting clarification as to the policy of the Norfolk school system regarding the incident involving Kimberly's shirt. On April 19, 1992, Kimberly was reinstated to Blair Middle School. Mrs. Lord, who was at the school for the reinstatement, signed a suspension notice that indicated that the suspension was for one day and was at the request of Kimberly's mother.

Dr. Carter responded to the parents' letter with a letter dated April 25, 1991. He wrote that he had spoken with the senior school administrators at Blair Middle School and had concluded that Kimberly violated Rule One of the student pamphlet on rights, rules, regulations, and responsibilities. He wrote:

Clothing containing messages couched in strong language is inappropriate, especially when the language has an overt sexual connotation. Such messages are even more likely to be disruptive when directed at adolescents as opposed to mature adults.

Dr. Carter stated that he would not reverse the principal's decisions.

Kimberly and her parents utilized the appeal procedure by requesting and receiving a review of the plaintiff's suspension by the superintendent of schools. The plaintiff and her parents, however, did not appeal to the school board, the next level of appeal after Dr. Carter. With the support of the American Civil Liberties Union Foundation of Virginia, whom Mrs. Lord had consulted on the day of this incident, the plaintiff filed a civil rights action with this Court.

## III. DUE PROCESS CLAIM

### A. *Testimony, Argument, and Findings of Fact*

In her complaint, plaintiff asserted that defendants subjected her to an indefinite suspension and that she was denied due process because she did not receive notice or an opportunity to be heard.[1] The parties dispute the length of Kimberly's suspension and the events prior to her suspension, including whether she received adequate notice and a hearing.

Kimberly testified that the principal told her that she was suspended but did not indicate the length of the suspension. The principal testified that Kimberly was not suspended when she left with her stepfather but, instead, had opted to leave school for the remainder of the day. Several ad-

---

1. Although plaintiff asserted in her brief that her due process right was violated by the lack of notification of her right to appeal, her due process argument at trial focused on her right to notice and a hearing regarding her violative conduct. Moreover, by plaintiff's admission, the principal gave Kimberly and her stepfather a copy of the student rules pamphlet to take home. Plaintiff thereby received notice of her appeal rights, which she exercised in part.

ministrators, including the school's dean of students, the school's principal, and the then-deputy superintendent of Norfolk public schools, testified that parents may take a child home during the school day without the child's removal resulting in suspension. School administrators will permit a parent to take home a student essentially to provide the student a cooling-off period to avoid the reflection on the student's record of even a one-day suspension.

The Court finds that Kimberly had not been suspended at the time she and her stepfather left the school. Kimberly's suspension was prompted by Mrs. Lord's telephone call to Ms. Watson, which occurred after Kimberly returned home from school. In that call, Mrs. Lord stated to Mr. Caprio that Kimberly would continue to wear the shirt to school and that Kimberly would return to the school that day wearing the shirt. Kimberly was suspended not for wearing the shirt to school, but for refusing a request by the principal not to wear it.

■ Mrs. Lord admitted that on April 17, 1991, she received the written suspension notice, which stated that Kimberly was suspended for one day. Mrs. Lord testified that, in her understanding, Kimberly had been suspended for one day and would be suspended again each time she wore the shirt to school thereafter. The plaintiff argues that the fact that she would be suspended for one day each time she wore the shirt to school is tantamount to an indefinite suspension.

The Court finds the plaintiff's attempt to combine a one-day suspension with possible future suspensions to create an indefinite suspension to be an act of sophistry. This specious reasoning would transform virtually any limited suspension into an indefinite suspension; presumably, the act for which one is validly suspended, if repeated, again would result in suspension. The Court finds that Kimberly was suspended for one day only; accordingly, plaintiff was entitled only to due process for a suspension of that duration.

The parties dispute the substance of Mr. Williams's statements to Mrs. Lord. Although Mrs. Lord contends that Mr. Williams told her that Kimberly had a right to wear the shirt to class, Mr. Williams denied indicating anything other than his desire that the parents cooperate with the school officials' request that Kimberly change into an appropriate shirt.

The plaintiff asserts that Mr. Williams had overruled the principal's decision that Kimberly must change out of her "Drugs Suck!" shirt and into an appropriate shirt before she would be admitted to class. At the time of her first telephone conversation with Mr. Williams, Mrs. Lord initially may have had the impression that he had overruled Mr. Caprio. This Court finds as a fact, however, that, by the time of their second conversation at noon, Mrs. Lord knew that Mr. Williams had not overruled Mr. Caprio, and that her interpretation was in error. This Court further finds as a fact that, prior to going to the school, Mr. Lord also knew that Mr. Williams supported Mr. Caprio, as Mr. Lord's discussion with Mr. Caprio at the school occurred after he had listened to the second conversation between Mrs. Lord and Mr. Williams.

■ Plaintiff claims she was suspended summarily, without the requisite notice or opportunity to be heard. Neither plaintiff nor her parents dispute that, in several communications to both plaintiff and her parents, Blair Middle School officials notified them that they found the shirt to be inappropriate attire for school. Both of Kimberly's parents discussed the appropriateness of the word "suck" on Kimberly's shirt with Blair Middle School administrators.

Mr. Lord and Kimberly admit that Mr. Caprio told them that Kimberly had violated Rule One, that Mr. Caprio showed them Rule One in the student pamphlet, and that Mr. Lord, on Kimberly's behalf, debated the appropriateness of the language on her shirt. The index card left at the school by Mr. Lord reflects his thoughts, in that he asserted that the language on the shirt is

not obscene.[2] The principal clearly informed Kimberly of her options to replace her shirt with an appropriate shirt or to leave school for the remainder of the day. He informed her that if she stayed at school and refused to change the shirt, she would be subject to suspension. At that time, Kimberly, her stepfather, and the principal discussed Rule One. Kimberly and her parents thus received notice that her shirt violated Rule One.

The Court finds that, when Kimberly chose not to change the shirt after conferring with her parents, she knew that the school objected to the word "suck" as inappropriate for school attire and that she could be subject to disciplinary action for refusing the request to change the shirt and remaining in school. Moreover, Kimberly's mother certainly was on notice of the possibility of disciplinary action prior to her last call to Mr. Caprio, in which she requested a formal suspension.

On March 2, 1992, plaintiff moved for summary judgment on the ground that the Norfolk Public School regulation that she was found to have violated is unconstitutional because it is vague and overbroad. The plaintiff had not previously asserted that the regulation was void for vagueness or overbreadth. The Court found that the vagueness and overbreadth issue was not properly and timely asserted; therefore, it was not properly before the Court. Even if plaintiff properly had pleaded vagueness and overbreadth, the Court finds that she and her parents had a clear and specific explanation of the regulation and that she violated it; thus, her claim has no merit.

**B.** *Legal Analysis*

■ In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court held that a student has a property interest in public education that is entitled to due process protection. *Id.* at 573–74, 95 S.Ct. at 735–36. The amount of process due is contingent on the length of the suspension. The *Goss* Court distin-

guished between the process that is required for a suspension of ten days or less and the process due for a suspension of more than ten days. *Id.* at 576, 95 S.Ct. at 737. Due process requires that a student facing suspension of ten days or less must receive oral or written notice of the charge against her and an opportunity to present her story. No waiting period between the misconduct and the hearing is required. *Id.* at 576, 95 S.Ct. at 740.

The Court finds that, prior to her one-day suspension, plaintiff received adequate notice of the conduct that the school found to be violative of Rule One. The Court further finds that Kimberly and her stepfather had adequate opportunity to rebut the school administrators' finding that the shirt was inappropriate attire for school. The Court finds as a fact that Kimberly and her parents were well aware of the reason why the school found her to have violated Rule One. Kimberly rejected the opportunity to avoid suspension either by changing the shirt or by voluntarily going home for the remainder of the day. The Court finds as a matter of fact and law that defendants not only complied with the *Goss* standard of due process, but they supplied Kimberly with more than the constitutionally mandated procedures. The Court GRANTS judgment as a matter of law against plaintiff on the due process claim.

## IV. FIRST AMENDMENT CLAIM

**A.** *Testimony, Argument, and Findings of Fact*

Plaintiff asserts that the school may prohibit expression only when there is a showing of a reasonable forecast that the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school. Defendants contend that the school may regulate students' offensive speech in school in an attempt to promote decency and values in students.

---

**2.** There was no assertion by defendants that the word is legally obscene, and this Court does not decide the case on that basis. The issue is whether the shirt was inappropriate for school and whether she could be disciplined for refusing to change her shirt.

In an attempt to illustrate plaintiff's contention that the shirt was not disruptive, Kimberly testified that she wore the "Drugs Suck!" shirt eight times in plain view at school before the day she was suspended. Plaintiff's mother, Mrs. Lord, testified that Kimberly wore the shirt to school between six and eight times. Two schoolmates of Kimberly's testified that they saw her wear the shirt to school on two occasions prior to her suspension.

Defendants presented testimony from Kimberly's second, third, fourth, fifth, and sixth period teachers, as well as from other administrators, that they had never seen her wear the shirt to school before April 17, 1991. The school calendar reveals that there were only ten school days between the evening she bought the shirt and the day she was suspended. The Court discounts plaintiff's testimony that she wore the shirt six to eight of ten possible days and finds more credible her teachers' testimony that she did not wear it in plain view of the teachers on prior occasions at school.

Plaintiff, who at trial was an articulate, mature young lady of thirteen, testified that the word "suck" did not have an offensive, vulgar, or sexual connotation to her. She testified that the shirt's message was that it is "not right to use drugs," a message that she wanted to convey to others. She intended the shirt to be provocative in its anti-drug message. Plaintiff asserts that children her age generally do not consider the word "suck" to have a vulgar or sexual connotation.

Plaintiff presented testimony from two of Kimberly's classmates that the message of "Drugs Suck!" is that drugs are bad. On cross-examination, both children admitted that they understood that the word has a vulgar connotation and that they would hesitate to use the word in front of school officials, parents, and grandparents because they knew it might offend them. One of the classmates was aware of the word's sexual meaning. Several teachers from Blair Middle School, testifying for defendants, stated that they know some students understand the sexual meaning of the word "suck," because the teachers have seen the word used in that manner in students' notes and drawings. Defendants presented testimony from other school administrators that children of middleschool age know the word to have sexual connotations.

Ms. Watson, dean of students, testified that, although she considered the word on Kimberly's shirt disruptive and was concerned that students would interpret the word to have a sexual meaning, her main concern was that the word "suck" as used on Kimberly's shirt is not appropriate in polite company and wished to discourage that language.

Ms. Artese, Kimberly's Communication Skills teacher, testified that the word was inappropriate and would be disruptive to the educational process. She explained that, from her experience as a teacher, certain words such as body parts and insults detract from the educational process and that children of this age group are particularly easily distracted. Ms. Artese's primary concern about the shirt, therefore, was the sexual connotation of the word "suck," which could be disruptive because children of that age are distracted easily by words that could be construed as having a sexual meaning.

The principal, Mr. Caprio, testified that the word "suck" on Kimberly's shirt would have a sexual connotation to a majority of students at Blair, regardless of the context of the word. He testified that allowing Kimberly to wear the shirt to school would give the appearance that the school condoned the usage of the word "suck."

The parties dispute whether the phrase "Drugs Suck!" on a student's shirt reasonably could be considered offensive or sexual. Both sides presented experts to testify on the etymology and meaning of the word in the usage "X sucks," "X" being a noun used as a subject, and "sucks" being an intransitive verb. The experts presented their interpretations of the derivation and meaning of the word "suck," after consulting dictionaries and articles on slang usage and searching the popular press for usage of the phrase "X sucks." Neither expert conducted primary research on the mean-

ing of the word to children aged eleven to fifteen years.

Plaintiff's expert, Dr. Butters, an English Professor at Duke University, testified that the word has a meaning of disapproval or disparagement among younger people. Since the time of his discovery deposition, Dr. Butters found a single scholarly article discussing the word "suck". The article, which appeared in *Maladicta* in 1983, buttressed his opinion that the word "suck" in this context indicates that drugs are bad. Dr. Butters testified that the context of the word "suck" and the sophistication of the hearer are factors in the word's meaning. He read the Oxford English Dictionary entry on "suck" to distinguish between the transitive usage, meaning an oral-genital sexual act, and the intransitive usage, meaning disapproval or disparagement.

Plaintiff's expert would not rule out the possibility that the meaning of the word "suck" as bad or deplorable derived from the sexual meaning of the word. He testified that the word is in a state of amelioration in that its recent meaning of disapproval is not as crude as its older meaning of oral-genital sexual contact.

The Court finds useful the testimony regarding popular press usage of the phrase "X sucks" prior to April 17, 1991. This testimony helps in the evaluation of whether the word "suck" is objectively offensive or vulgar and whether a reasonable school administrator could find it offensive or vulgar. The experts found the earliest usage in a 1972 editor's note in *Esquire*, which referred to a 1968 article entitled "Hell Sucks." The *New York Times*, which claims to report "all the news that is fit to print," had not printed the expression "X sucks" before April 17, 1991.

Defendants' expert, Dr. Johnson, a professor at Virginia Wesleyan College, testified that "sucks" may have a sexual connotation even when used as an intransitive verb, as in "X sucks." She testified that the Oxford English Dictionary listed a usage of the word "suck" without a direct object that had the sexual meaning of "fellatio." She also noted that several dictionaries of slang did not differentiate between the transitive and intransitive uses with regard to the word's sexual connotation.

Defendants presented testimony from an expert in school administration, Dr. Spiva, a professor at Old Dominion University, who testified that suggestive words such as "suck" create disturbances in the school atmosphere.

The Court finds that a reasonable middle school administrator could find that the word "suck," even as used on the shirt, may be interpreted to have a sexual connotation. This is not to say that the phrase "Drugs Suck!" is reasonably interpreted to mean that drugs were engaging in sexual activity or that the shirt advocates sexual activity of any form. Rather, the meaning of "disapproval" in the use of the phrase "X sucks" derives from a sexual connotation of oral-genital contact. Although the anti-drug message itself admittedly makes no sexual statement, the use of the word "suck," and its likely derivation from a sexual meaning, is objectionable. The Court finds that, regardless of whether the word connotes a sexual meaning, its use is offensive and vulgar to many people, including some students between the ages of eleven and fifteen. The Court finds that the use of the expression under these circumstances in this school was disruptive.

## B. *Legal Analysis*

The parties agree that the Blair Middle School administrators sought to suppress the manner in which the message was conveyed, not the message itself. Thus, the case concerns only the authority of school officials to regulate language displayed on clothing that they reasonably regard as inappropriate and offensive. Reasonable and nondiscriminatory regulations on time, place, and manner are permissible restrictions upon expression.

*Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), is the high-water mark for public school students' First Amendment rights. In *Tinker*, high school students were suspended for wearing black

arm bands, which constituted symbolic speech, in violation of a school rule prohibiting arm bands. The Supreme Court held the political anti-war message of the black arm bands to be protected speech for which students could not be suspended. In *Tinker*, the school sought to suppress not the form of the message, but the message itself.

Under *Tinker*, a school must show that engaging in forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school. *Id.* at 509, 89 S.Ct. at 738. A school may regulate conduct that materially disrupts classwork or involves substantial disorder or invasion of rights of others. *Id.* at 509, 89 S.Ct. at 738. The *Tinker* Court stated that the disruption must be more than hypothetical: there must be at least a reasonable forecast of disruption. *Id.* at 514, 89 S.Ct. at 740. The defendants dispute that *Tinker* reflects the current state of the law. Even if *Tinker* were the appropriate test, however, the school met the *Tinker* requirements.[3]

■ The defendants argue that the *Tinker* standard of a reasonable forecast of material and substantial interference with discipline is no longer the only circumstance in which a school may regulate student expression. Defendants assert that schools may regulate a student's speech in its role as instructor of the boundaries of socially acceptable behavior. It seems clear that, when schools seek to regulate the form of the message rather than the message, they may do so. *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986).

In *Fraser*, a fourteen-year-old public high school student delivered a speech in a school assembly. The language of the speech was an extended sexual metaphor, although no blatantly sexual words were used. The student received prior notice from teachers who reviewed the speech and found it inappropriate, but none of them suggested that it would violate a school disciplinary rule. After giving the speech in a school-sponsored assembly, the student was suspended for a few days. The Supreme Court found that the speech was not protected under the First Amendment.[4] The Court distinguished the sexually suggestive message in *Fraser* from the nondisruptive expression of a political viewpoint in *Tinker*. *Id.* at 680, 106 S.Ct. at 3163.

■ The *Fraser* Court enunciated a balancing test: the freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against society's countervailing interest in teaching students the boundaries of socially appropriate behavior. *Id.* at 681, 106 S.Ct. at 3163. Public school students have fewer rights in school than do adults in other settings. *Id.* at 682, 106 S.Ct. at 3159; *see also Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir.1989), *cert. denied*, 493 U.S. 1021, 110 S.Ct. 723, 107 L.Ed.2d 742 (1990) ("Limitations on speech that would be unconstitutional outside the schoolhouse are not necessarily unconstitutional within it."); *cf. Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (Schools "need not tolerate student speech that is inconsistent with its 'basic educational mission' even though the government could not censor similar speech outside the school.") (citing *Fraser*). The *Fraser* Court found that "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." *Id.* at 683, 106 S.Ct. at 3164. "[T]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." *Id.* at 683, 106 S.Ct. at 3164.

The *Fraser* Court upheld the student's suspension on the basis of the school's re-

---

3. The Court heard testimony that school administrators and teachers considered the shirt disruptive. These witnesses testified that children aged eleven to fifteen are easily distracted by language with sexual connotations. The principal testified that most students at the school would understand "suck" to have an underlying sexual meaning, regardless of its context.

4. The Court also found that the disciplinary rule gave the student adequate warning that he would be sanctioned for delivering such a

sponsibility to teach students socially appropriate behavior and to disassociate the school from inappropriate behavior: "We hold that petitioner School District acted entirely within its permissible authority in imposing sanctions upon Fraser in response to his offensively lewd and indecent speech." *Id.* at 685, 106 S.Ct. at 3165; *see also id.* at 682–83, 106 S.Ct. at 3164 (citing *Thomas v. Board of Educ., Granville Cent. Sch. Dist.,* 607 F.2d 1043, 1057 (2d Cir.1979), *cert. denied,* 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980) (Newman, J., concurring)) (First Amendment "gives a high school student the classroom right to wear Tinker's armband but not Cohen's jacket," which bore the message "Fuck the Draft").

█ Speech need not be sexual to be prohibited by school officials; speech that is merely lewd, indecent, or offensive is subject to limitation. "The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech...." *Id.* at 683, 106 S.Ct. at 3164; *see also id.* 478 U.S. at 692, at 3169 (Steven, J., dissenting) (even if audience is not offended by speech, or speaker honestly believed speech was inoffensive, speaker may not have constitutional right to deliver it); *Martin v. Parrish,* 805 F.2d 583 (5th Cir.1986) (dismissal of college professor for using terms such as "bullshit," "hell," "damn," "Goddamn," and "sucks" in the classroom); *Thomas,* 607 F.2d 1043 (school authorities may regulate indecent language because its circulation on school grounds undermines the responsibility to promote standards of decency).

Even while disagreeing with the *Fraser* result, Justice Stevens, quoting from the movie "Gone with the Wind," wrote in his dissenting opinion:

"Frankly, my dear, I don't give a damn."

When I was a high school student, the use of those words in a public forum

shocked the Nation. Today Clark Gable's four-letter expletive is less offensive than it was then. Nevertheless, I assume that high school administrators may prohibit the use of that word in classroom discussion and even in extracurricular activities that are sponsored by the school and held on school premises.

*Id.* at 691, 106 S.Ct. at 3168 (Stevens, J., dissenting). Schools thus may limit usage of the word "suck," which in today's vernacular is more offensive than "damn."

█ The Supreme Court has given great deference to school boards, as in *Fraser.* Recent cases have evidenced a concern for values and decency in addition to school order. This Court, too, believes that school boards, school administrators, principals, and teachers must be permitted to govern schools attended by children.[5] The school's authority to control the presentation of the lesson must remain unfettered. *See Poling,* 872 F.2d at 762 ("Local school officials ... must obviously be accorded wide latitude in choosing which pedagogical values to emphasize, and in choosing the means through which those values are to be promoted."); *Quarterman v. Byrd,* 453 F.2d 54 (4th Cir.1971) ("In prescribing general conduct within the school, the school authorities must have a 'wide latitude of discretion, subject only to the restriction of reasonableness.'") (citation omitted); *cf. Fraser,* 478 U.S. at 683, 106 S.Ct. at 3165 (school board should determine whether manner of speech is inappropriate for classroom); *id.* 478 U.S. at 692, at 3169 (Stevens, J., dissenting) ("[T]he school—not the student—must prescribe the rules of conduct in an educational institution."); *Tinker,* 393 U.S. at 506, 511, 89 S.Ct. at 746 (Constitution does not compel school officials "to surrender control of the American public school system to public school students"). The federal courts, ill-suited as they are to second guess decisions of school authorities, should interfere only in the most stringent circumstances.

speech. *Fraser,* 478 U.S. at 686, 106 S.Ct. at 3166.

**5.** Understandably, the parents in this case believe strongly in their rights, as well as those of

their twelve-year-old child. We must consider, however, the results if each of the 1200 Blair school students wore clothing with offensive messages.

*See Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).  This is not such a case.

The Court finds that the school administration's determination that the word "suck" in the context of Kimberly's shirt is lewd, vulgar, or offensive is not merely a "prudish failure to distinguish the vigorous from the vulgar," *Thomas,* 607 F.2d at 1057 (Newman, J., concurring), but rather is a permissible decision by the school to regulate middle school children's language and channel their expression into socially appropriate speech.  The word "suck" does have sexual connotations.  Even its meaning of "disapproval" likely evolved from its sexual meaning only as recently as the 1970s.

First Amendment rights must be applied "in light of the special characteristics of the school environment." *Tinker,* 393 U.S. at 506, 89 S.Ct. at 736.  In this case, the Blair Middle School environment consists of sixth, seventh, and eighth graders aged eleven to fifteen.  This child may have been mature for her twelve years, but other students of that age, or younger, may not be equally precocious.  Teachers and administrators must have the authority to do what they reasonably believe is in the best interest of their educational responsibilities, as we cannot abandon our schools to the whims or proclivities of children.  The Court finds that Blair Middle School officials had an interest in protecting their young students from exposure to vulgar and offensive language.

The Court holds that, even if defendants were held to the *Tinker* standard, the defendants demonstrated a reasonable forecast of disruption.  Under either *Tinker,* a content-based case, or *Fraser,* which, like this case, is content-neutral, the defendants did not violate Kimberly's First Amendment rights by suspending her for refusing to change her shirt.

## V.  CONCLUSION

The Court FINDS in favor of the defendants on the First Amendment claim and on the due process claim.  The Court GRANTS judgment in favor of the defen-

dants and DENIES plaintiff's requests for relief.

IT IS SO ORDERED.