**Jeffrey J. PYLE and Jonathan H. Pyle, By and Through his father and next friend, Christopher H. PYLE, Plaintiffs,**

**v.**

**The SOUTH HADLEY SCHOOL COM-MITTEE, Charles F. Kimball, Individually and in his capacity as Interim Superintendent of South Hadley High School, Paul Raymond, Individually and in his capacity as Interim Principal of South Hadley High School, and Donna Theroux–Cole, Steven M. Marantz, Chairman, Robert L. Gouin, Mary Jo Moore, Kevin Taugher, Individually, and in their capacity as Members of the South Hadley School Committee, Defendants.**

Civ. A. No. 93–30102–MAP.

United States District Court,
D. Massachusetts.

Aug. 26, 1994.

John Reinstein, Civ. Liberties Union of Mass., Boston, MA, William Newman, Civil Liberties Union, Northampton, MA, Sarah Wunsch, Mass. Civil Liberties Union Fdn., Boston, MA, for plaintiffs.

Raymond R. Randall, Ryan, Boudreau, Randall & Kirkpatrick, South Hadley, MA, for defendants.

## MEMORANDUM

PONSOR, District Judge.

### I. INTRODUCTION

This case is a reminder that it is easy to assume a tempest in a teapot is trivial, unless you happen to be in the teapot.

The tumult here arose when two students at South Hadley High School wore T-shirts—one reading "See Dick Drink. See Dick Drive. See Dick Die. Don't be a Dick" and the other reading "Coed Naked Band: Do It To the Rhythm"—that teachers, school administrators and, ultimately, the town's school committee decided were unacceptable school dress.

The students then sued the superintendent and school board, claiming that the school's dress code generally, and its application to the two T-shirts specifically, violated their First Amendment rights. This court denied

the students' motion for preliminary injunction, which sought an immediate order barring the school's prohibition of the particular T-shirts. A four-day bench trial followed regarding the shirts and two provisions of the dress code, one addressing vulgarity and the other harassment.

The court's recitation of facts and discussion of the law below is lengthy, but its essence can be quickly summarized.

■ The First Amendment limits minimally, if at all, the discretion of secondary school officials to restrict so called "vulgar" speech—including speech containing sexual innuendo, however lukewarm by some standards. The sexual witticism at issue in this case is almost identical in tone to the student's remarks reported in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). In that case the Supreme Court affirmed the school's power to curb, and even discipline, the speaker. Similarly here, the school's exercise of its authority to limit the sexual double entendre on these T-shirts, even where there was no immediate prospect of disruption, did not run afoul of the First Amendment.

■ Plaintiffs argue that, even if school administrators have the hypothetical power to limit "vulgar" speech, this court must itself weigh the slogans on its own scale of offensiveness and conclude that these particular T-shirts simply were *not* vulgar. The question then becomes, who decides what is "vulgar"? The answer in most cases is easy: assuming general reasonableness, the citizens of the community, through their elected representatives on the school board and the school administrators appointed by them, make the decision. On questions of coarseness or ribaldry in school, federal courts do not decide how far is too far.

This is because people will *always* differ on the level of crudity required before a school administrator should react. The T-shirts in question here may strike people variously as humorous, innocuous, stupid or

indecent. In assessing the acceptability of various forms of vulgar expression in a secondary school, however, the limits are to be debated and decided within the community; the rules may even vary from one school district to another as the diversity of culture dictates. The administrators here acted within reason, and the court's inquiry need go no further. Therefore, the court will deny the motion for injunctive relief directed at the two T-shirts themselves and at that portion of the dress code forbidding clothing that is "obscene, profane, lewd or vulgar." [1]

■ As regards the second aspect of the dress code—the ban on clothing that "harasses, threatens, intimidates or demeans" certain individuals or groups—the plaintiffs' motion will be allowed. Enforcement of this portion of the code will be enjoined, except in circumstances where the clothing in question also creates a substantial risk of a material and substantial disruption to the daily operations of the school described in the Supreme Court's decision in *Tinker v. Des Moines School District*, 393 U.S. 503, 509, 89 S.Ct. 733, 738, 21 L.Ed.2d 731 (1969). Any other ruling would permit school officials to circumscribe improperly the expression of opinion on controversial issues, even where that expression contained no vulgarity and offered no threat to the orderly performance of the school's educational mission.

■ The First Amendment does not permit official repression or homogenization of ideas, even odious ideas, and even when the expression of these ideas may result in hurt feelings or a sense of being harassed. A school committee may not ban speech other than that reflecting the dominant or most comforting ethos. The "harassment" provision at issue here, while it obviously has laudable goals, gives school personnel precisely that excessive authority.

■ Of course, as this court has emphasized, school officials have the authority to limit expression that "would substantially interfere with the work of the school or im-

---

**1.** It is crucial to point out that this case does *not* involve any attempt to restrict books, educational materials, or classroom discussion, based on its vocabulary or content. The court's analysis in that event would be different. *See, e.g., Keefe v. Geanakos*, 418 F.2d 359 (1st Cir.1969) and *Right to Read Defense Committee v. School Committee of Chelsea*, 454 F.Supp. 703 (D.Mass.1978).

pinge upon the rights of other students." *Tinker v. Des Moines School Dist.,* 393 U.S. 503, 509, 89 S.Ct. 733, 738, 21 L.Ed.2d 731 (1969). But, where it is not disruptive or vulgar, a student's personal expression may not be censored on the basis of its content.

## II. FACTS

### A. The Parties

Plaintiff Jeffrey Pyle ("Jeffrey"), is now an eighteen-year-old freshman at Trinity College in Hartford, Connecticut. In 1993, he was a student at South Hadley High School and participated in the band and the drama club. Jeffrey's father, Christopher Pyle, a professor of constitutional law at Mount Holyoke College, is also a plaintiff, bringing this action on behalf of his minor son Jonathan, a sixteen-year-old sophomore still attending the high school. It is undisputed that both Jeffrey and Jonathan have achieved an excellent record, both academically and with respect to their extracurricular activities. They have been good students and good citizens of their school.

Defendants are: the South Hadley School Committee and its individual members; Charles Kimball, individually and in his capacity as Interim Superintendent of the South Hadley High School; and Paul Raymond, interim principal of the high school.

South Hadley is a town of approximately 16,000 inhabitants, located at the foot of the Holyoke Mountain range in Western Massachusetts. The area is rich in both history and culture. South Hadley has a strong commitment to the education of the town's students and is influenced, in part, by the presence of Mount Holyoke College as well as many of the excellent academic institutions nearby. The first public school in South Hadley was built in 1754. In 1870 the high school held a graduation for its first class—of two students. By 1900 the population of South Hadley had increased to approximately 4,500 and in 1904 the first woman school committee member, Mary Brainard, a retired high school teacher, was elected. In 1907, the high school graduated a "large" class of 16 students. Over the years, South Hadley has continued to grow, and the location of the high school has changed several times due to the demand for more space. Presently, approximately 785 students attend South Hadley High, in the eighth through twelfth grades, ranging in age from twelve to eighteen years old.

### B. Findings of Fact

The following facts emerged from the bench trial, which took place from March 28, 1994 to April 1, 1994.

The controversy over T-shirts in South Hadley can be traced back to some time during the 1991 school year. Prior to this time, an informal system was in place at the school. If a student wore an objectionable T-shirt to class, a teacher would ask the student to remove it or turn it inside out. The number of times this occurred in the past was minimal.

Then came the "Button Your Fly" controversy. Charles Kimball, principal of the high school in 1991, sent home a student wearing a T-shirt with this popular Levi–Strauss logo. At that time, the dress guidelines at South Hadley High School were set out in the folder given to each student at the beginning of the school year. A section entitled "Personal Appearance" stated:

> Personal appearance should not disrupt the educational process, call individual attention to the individual, violate federal, state, or local health and obscenity laws, or affect the welfare and safety of the students, teachers, or classmates. Students will be asked to change inappropriate attire.

Under this provision, Kimball sent the student home to change his T-shirt. Unfortunately, on his way from school the student fell off his moped and broke his arm.

The next day, approximately 20 to 30 students wore "Button Your Fly" T-shirts to school and staged a peaceful sit-in to protest the banning and the injury to their classmate. Jeffrey, then a sophomore at the high school, participated in this demonstration. Jonathan, a student in the middle school at the time, also wore the "Button Your Fly" T-shirt to his school.

In response to the protest, Principal Kimball eventually decided to allow the students to wear the T-shirts pending a school committee meeting on the subject. As now, the school committee consisted of five members.

At a meeting on May 24, 1991, the school committee decided, by a 3–2 vote, to allow the students to wear the "Button Your Fly" T-shirt. To no one's surprise, the logo's popularity plummeted following this decision, and until the Spring of 1993 the dress code issue lay dormant.

Troubles began to brew again on March 24, 1993, when Jeffrey wore a T-shirt to his gym class bearing the slogan "Coed Naked Band; Do It To The Rhythm" ("Coed Naked Band"). This shirt was a Christmas gift given to Jeffrey by his mother celebrating Jeffrey's involvement in the school band. After viewing the T-shirt, Jeffrey's gym teacher told him that it was unacceptable. Although she allowed Jeffrey to wear the shirt for the rest of her gym class, she warned him not to return to her class wearing the Coed Naked Band T-shirt.

In response, Jeffrey wrote a letter to acting principal Paul Raymond. In his letter, Jeffrey explained that, because he felt his constitutional right to freedom of expression was being violated, he intended to wear the T-shirt again. He noted that he had worn the Coed Naked Band T-shirt on several previous occasions and had not received any complaints. In addition, he had seen both boys and girls wearing "Coed Naked" T-shirts with various tag-lines at South Hadley High and never saw them cause a disruption. He concluded, "I am respectfully informing you that I plan to wear this shirt, and similar shirts, in the future. Of course, if any of my shirts were to cause a genuine disruption, I would change it immediately." Acting principal Raymond did not respond to Jeffrey's letter.

When the next gym class met, Jeffrey wore his Coed Naked Band T-shirt to class again. This time the teacher asked Jeffrey to change his shirt. When Jeffrey refused, he was given three detentions for insubordination and sent to the office. Acting Principal Raymond met with Jeffrey, and they both looked at a publication sponsored by the Massachusetts Department of Education, entitled "Check it Out," for guidance on the issue of dress codes. Raymond, unsure whether Jeffrey's T-shirt was permissible under the dress code then in effect, decided to seek guidance from the members of the school committee and put Jeffrey's detentions on hold until the April 6, 1993 meeting.

In the days prior to April 6, Jeffrey deliberately continued to test the rules by wearing two new T-shirts to gym class. One T-shirt depicted two men in naval uniform kissing each other with a tag line "Read My Lips." The second T-shirt depicted a marijuana leaf and stated "Legalize It." Neither prompted an objection.

At the April 6, 1993 school committee meeting Jeffrey orally presented his views regarding censorship and the boundaries of a student's First Amendment rights. Also speaking at that meeting was Jeffrey's gym teacher, who explained her ground rules of acceptable behavior. Students were not allowed to wear T-shirts that targeted or harassed a person because of race, sex, religion, or sexual orientation. During the past few years, this teacher had used the "Coed Naked" series of shirts as an example of what she considered unacceptable dress in her gym class. *See* Affidavit of Susan Tyler at ¶ 3.

During the meeting, Jeffrey requested that the school committee formally draft a dress code because, in his opinion, the current guidelines were too vague. The school committee believed that the school's informal policy of requesting a student to change an objectionable T-shirt had proved successful. They were at first reluctant to attempt a more formal dress code.

By the end of the April 6th meeting, however, the school committee agreed not to enforce the three detentions given to Jeffrey and to consider the dress code issue further. On April 7, 1993, Jeffrey sent a letter to the members of the School Committee outlining once more his request that the school committee adopt a new, formal dress code.

On April 20, 1993, the school committee held a second meeting at which it considered proposals to amend the existing guidelines

regarding dress. After reviewing a dress code then in use at the Longmeadow High School, the school committee decided to adopt a similar approach, later embodied in a memo dated April 29.

On April 22, 1993, Christopher Pyle, Jeffrey and Jonathan's father, sent School Committee Chairperson Steven Marantz a ten page single-spaced letter, setting forth specific objections to the newly adopted dress code and offering several suggestions to cure what he viewed as its constitutional infirmities. The School Committee did not respond to Professor Pyle's letter.

On April 29, 1993, the students, faculty, staff, and parents of students at South Hadley High School were sent the following notice.

TO: Students, Faculty, Staff and Parents

FROM: Paul R. Raymond, Interim Principal

Subject: Dress Code at South Hadley High School

On Tuesday, April 20, 1993 and again on Tuesday, April 27, 1993 the South Hadley School Committee voted to amend the current dress code to read as follows:

*CURRENTLY IN THE DRESS CODE:*

Personal appearance should not disrupt the educational process, call singular attention to the individual, violate federal, state, or local health and obscenity laws, or affect the welfare and safety of the students, teachers, or classmates.

*ADDITIONS TO THE DRESS CODE:*

Students, therefore, are not to wear clothing that:

1. Has comments or designs that are obscene, lewd or vulgar.

2. Is directed toward or intended to harass, threaten, intimidate, or demean an individual or group of individuals, because of sex, color, race, religion, handicap, national origin, or sexual orientation.

3. Advertises alcoholic beverages, tobacco products, or illegal drugs.

If such clothing is worn to school, students will be required to change or will be sent home to do so.

Clothing expressing political views is allowed as long as the views are not expressed in a lewd, obscene or vulgar manner.

This policy will become effective per the direction of the South Hadley School Committee on Monday, May 3, 1993.

Plaintiffs' Exhibit 10.

On May 3, 1993, the day the code was to take effect, Jeffrey wore a T-shirt to school with the slogan "Coed Naked Civil Liberties: Do It To The Amendments" ("Coed Naked Civil Liberties" T-shirt) to signify his opposition to the new dress code.[2] The same day, Jonathan, a sophomore, wore a T-shirt bearing the slogan: "See Dick Drink. See Dick Drive. See Dick Die. Don't Be A Dick" ("See Dick" T-shirt). Jonathan and Jeffrey wore these T-shirts for about four periods with no incident. Later in the day, Jeffrey and Jonathan were sent down to the administration office where Acting Principal Raymond and Acting Vice–Principal Zajac told them that their T-shirts were unacceptable. They were given the usual three options: First, turn the T-shirt inside out; second, change into another T-shirt, or third, go home and change. Jeffrey and Jonathan decided to go home and did not return to school until the next day.

Following a letter from plaintiffs' counsel, the school committee took no action regarding the dress code from May 4 to May 11, so that they could meet and discuss counsel's concerns regarding the constitutionality of the amended dress code. On May 5, 1993, on the advice of counsel, the school committee agreed to retract the prohibition on the "Coed Naked Civil Liberties" and "See Dick" T-shirts pending a May 11, 1993 school committee meeting. Jeffrey and Jonathan were notified of this new position and wore these two T-shirts on May 7, 1993, without incident.

On May 11, 1993, the school committee reconvened and discussed the dress code with plaintiffs' counsel. This meeting had several results. First, the school committee reaffirmed the guidelines set forth in the April 29 memorandum. Second, the commit-

---

2. This T-shirt was a gift to Jeffrey's father Christopher Pyle from his Mount Holyoke students.

tee defeated a motion to continue to permit the "See Dick" and "Civil Liberties" T-shirts. These shirts were therefore again off limits. Third, the committee granted the school administration (Kimball, Raymond and Zajac) the authority to interpret and enforce the code.

That same day, May 11th, Jonathan protested the dress code by wearing a homemade T-shirt bearing a picture of a gerbil and the tagline "Coed Naked Gerbils" on the front and "Some People Will Censor Anything" on the back. Jonathan was sent to the office where his T-shirt was reviewed by Kimball, Raymond, and Zajac. Kimball said that while he personally found the shirt to be inappropriate, it did not violate the dress code. Jonathan was then given a pass to return to class.

On May 14, 1993, Jonathan wore a T-shirt that read "Coed Naked Censorship—They Do It In South Hadley." One of his teachers sent Jonathan down to the office to get an evaluation of the T-shirt. Kimball looked at the T-shirt and found that it did not violate the dress code. Once more, Jonathan was given a pass to return to his class. Jonathan wore this T-shirt to school on another day and did not experience any problems. He also wore a T-shirt celebrating the Smith College centennial, and reading "A Century of Women on Top," without incident.

Jonathan and Jeffrey both admit that they selected these T-shirts to protest censorship and to test the capacity of the administration to distinguish prohibited from permitted messages. At least three of the shirts (Coed Naked Censorship, Coed Naked Civil Liberties and Coed Naked Gerbils) were custom-created to test, and lampoon, the borders of the permitted range.

On May 17, 1993, Jeffrey wore the Coed Naked Civil Liberties T-shirt again to school. Jeffrey was sent to the office, where Principal Kimball reviewed the shirt and, this time, found that it did not violate the dress code. Jeffrey returned to class and wore the T-shirt for the rest of the school day. That same day, Jonathan wore the "See Dick" T-shirt again. Vice-principal Zajac told Jonathan that the T-shirt was unacceptable. Unwilling to change, Jonathan left school.

On May 18, 1993, Jeffrey tested the waters again with his "Coed Naked Band" T-shirt. By first period, he was sent down to Kimball's office, where he was told the shirt was not acceptable. Concerned with missing more classes, Jeffrey decided to change into a non-objectionable T-shirt. A short time later, Jeffrey graduated from South Hadley High School.

On May 18, 1993, Kimball sent a memorandum to the faculty at South Hadley High school regarding the dress code. In it, Kimball advised that

> [t]he faculty should understand that every shirt or hat or whatever that you personally feel is off color or in bad taste will not automatically be found in violation of our present dress code. The code is designed to prevent lewd, obscene and vulgar statements on clothing and to prevent people from intimidating, demeaning or harassing students and staff on the basis of sex, creed, national origin, etc.

Kimball concluded that if a teacher had any questions regarding the appropriateness of a student's clothing, the student should be sent down to the office for a decision.

In the 1993–94 school year, South Hadley's Dress Code read, in pertinent part:

> e. Students are not to wear clothing (including hats) which cause a disruption to the educational process or the orderly operation of the school. This includes clothing that:

> 1. Has comments, pictures, slogans, or designs that are obscene, profane, lewd or vulgar.

> 2. Harasses, threatens, intimidates or demeans an individual or group of individuals because of sex, color, race, religion, handicap, national origin or sexual orientation.

> 3. Advertises alcoholic beverages, tobacco products, or illegal drugs.

> If such clothing is worn to school, students will be required to change or cover said clothing or will be sent home to do so. Refusal to change or cover said clothing will result in the students not being allowed to attend class until they have complied with the code. The students should

understand that failure to attend class may subject them to a penalty under the existing class attendance and truancy regulations at South Hadley High School and the South Hadley School Department.

Plaintiffs' Exhibit 22.

On this rendition of the code, defendants inadvertently omitted the provision concerning protection for expression of political views. On February 15, 1994, the defendants amended the September 1, 1993 dress code and added one final sentence.

Clothing expressing political views clearly is allowed as long as the views are not expressed in a lewd, obscene, profane or vulgar manner.

See Plaintiff's Exhibit 23. This dress code now remains in effect at South Hadley High School and is, in part, the subject of this lawsuit.

### III. DISCUSSION

A. *Applicable Supreme Court Decisions Concerning Students' Right to Freedom of Expression*

Three important Supreme Court cases define the scope of a student's right to freedom of expression while in secondary school.

First, in 1969 the United States Supreme Court decided *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), holding that a student's black armband worn as a protest against the Vietnam War was constitutionally protected speech.[3] In *Tinker,* the Supreme Court stated that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506, 89 S.Ct. at 736. While recognizing students' right to express themselves freely, the Court also

recognized the need "for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507, 89 S.Ct. at 736 (citation omitted).

Significantly, the Court reasoned as follows.

The school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of the petitioners. There is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and left alone. Accordingly, this case does not concern speech or action that intrudes upon the work of the school or the rights of other students.

*Id.* at 508, 89 S.Ct. at 737. The Court concluded that the ban on the armbands could not be sustained, because the school failed to show that the wearing of the armbands materially and substantially interfered with the operation of the school.

Second, in *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), the Supreme Court reaffirmed the holding in *Tinker* and refined the law regarding the right of free speech in secondary school. The facts of *Fraser* are as follows. Matthew Fraser, a student at Bethel High School, delivered a speech at a high school assembly in support of a candidate for student government. Approximately 600 students attended the assembly. In nominating a fellow student for an elected office, Fraser described his candidate "in terms of an elaborate, graphic, and explicit sexual metaphor."[4] The school disciplined

---

**3.** In *Tinker,* a handful of students wore black armbands in protest of the United States involvement in Vietnam. Pursuant to the school's policy regarding armbands, school administrators asked the students to take off the armbands while in school. When they refused to comply with this request, the students were sent home and suspended until they returned to school without the armbands. *Id.* at 504, 89 S.Ct. at 735.

**4.** In addressing the student body, Fraser said the following.

"I know a man who is firm—he's firm in his pants, he's firm in the shirt, his character is firm—but most ... of all, his belief in you, the students of Bethel, is firm.

"Jeff Kuhlman is a man who takes his point and pounds it in. If necessary, he'll take an issue and nail it to the wall. He doesn't attack things in spurts—he drives hard, pushing and pushing until finally—he succeeds.

"Jeff is a man who will go to the very end— even the climax, for each and every one of you.

Fraser, imposing a three-day suspension for deliberately using sexual innuendo in the speech, and removing his name from the list of potential candidates for graduation speaker at the school's commencement.[5] Subsequently, Fraser filed suit in district court alleging a violation of his First Amendment right to freedom of speech.

The district court held that the school's action violated Fraser's rights to free speech under the First Amendment. The Court of Appeals affirmed the district court decision, reasoning that Fraser's case fell within the rubric of *Tinker*. The Supreme Court reversed, distinguishing the war protest in *Tinker* from the sexual content of the speech by Fraser.

> The marked distinction between the political "message" of the armbands in *Tinker* and the sexual content of respondent's speech in this case seems to have been given little weight by the Court of Appeals. In upholding the students' right to engage in nondisruptive, passive expression of a political viewpoint in *Tinker*, this Court was careful to note the case did "not concern speech or action that intrudes upon the work of the schools or the rights of other students."

*Id.*, 478 U.S. at 680, 106 S.Ct. at 3163 (citation omitted).

Balancing the students' right to express unpopular and controversial views against the role of the school to inculcate civility in its students, the Court concluded that Fraser's speech was not entitled to First Amendment protection.

> The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by this confused boy.

"So vote for Jeff for A.S.B. vice-president—he'll never come between you and the best our high school can be."
*Id.*, 478 U.S. at 687, 106 S.Ct. at 3166 (J. Brennan, concurring).

5. The Bethel High School disciplinary rule, which to some extent tracks the language found in *Tinker*, provides that

*Id.* at 683, 106 S.Ct. at 3164. In upholding the actions of the school the Court carefully distinguished the rights of adults from the rights of minor high school students.

> The First Amendment guarantees wide freedom in matters of adult public discourse. A sharply divided Court upheld the right to express an antidraft viewpoint in a public place, albeit in terms highly offensive to most citizens. *See Cohen v. California*, 403 U.S. 15 [91 S.Ct. 1780, 29 L.Ed.2d 284]. (1971). It does not follow, however, that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in public school. (citation omitted).... "the First Amendment gives a high school student the classroom right to wear *Tinker's* armband, but not *Cohen's* jacket." *Thomas v. Board of Education*, 607 F.2d 1043, 1057 (2nd Cir.1979).

*Id.*, 478 U.S. at 683, 106 S.Ct. at 3164.[6]

Finally, the most recent Supreme Court decision addressing a high school student's First Amendment rights is *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). The issue in that case was whether a school's decision to delete two pages of an article concerning teenage pregnancy from a school newspaper violated students' right to free speech. The articles were written by students in a journalism class.

In analyzing the First Amendment implications, the Court underlined *Tinker*'s holding that a school can prohibit speech that will "substantially interfere with the work of the school or impinge upon the rights of other students." The Court held, in addition, that a school could refuse to lend its name and resources even to non-disruptive expression. *Id.* at 266, 272–73, 108 S.Ct. at 567, 570–71

Conduct which materially and substantially interferes with the educational process is prohibited, including the use of obscene, profane language or gestures.
*Id.* at 678, 106 S.Ct. at 3162.

6. Cohen, an adult, had been arrested for wearing a jacket in a courthouse that read "Fuck the Draft."

(citations omitted). In distinguishing between school-sponsored and school-tolerated speech, the Court reasoned that a school

> ... need not tolerate student speech that is inconsistent with its "basic educational mission," even though the government could not censor similar speech outside the school. Accordingly, we held in *Fraser* that a student could be disciplined for having delivered a speech that was "sexually explicit" but not legally obscene at an official school assembly, because the school was entitled to "disassociate itself" from the speech in a manner that would demonstrate to others that such vulgarity is "wholly inconsistent with the 'fundamental values' of public school education." We thus recognized that "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board," rather than with the federal courts.

*Id.* at 266–67, 108 S.Ct. at 567–68 (Citations omitted).

The Court then distinguished the issue presented by *Tinker*, whether the First Amendment requires a school to *tolerate* particular student speech, from the issue in *Hazelwood*, whether the First Amendment requires a school affirmatively to *promote* particular student speech. *Id.* at 271, 108 S.Ct. at 570. Reasoning that educators have more control over school-sponsored speech, the Court held that the school could "disassociate" itself from certain speech even if the speech did not substantially interfere with the work of the school. *Id.* at 271, 108 S.Ct. at 570. In its analysis the Court noted the difference between *Tinker* and *Fraser*.

> The decision in *Fraser* rested on the "vulgar," "lewd," and "plainly offensive" character of a speech delivered at an official school assembly rather than on any propensity of the speech to "materially disrup[t] classwork or involv[e] substantial disorder or invasion of the rights of others."

*Id.* at 271 n. 4, 108 S.Ct. at 570 n. 4.

■ These cases reveal at least three approaches to the First Amendment rights of high school students. First, "vulgar" or plainly offensive speech (*Fraser*-type speech) may be prohibited without showing a showing of disruption or substantial interference with the school's work. Second, school-sponsored speech (*Hazelwood*-type speech) may be restricted when the limitation is reasonably related to legitimate educational concerns. Third, speech that is neither vulgar nor school-sponsored (*Tinker*-type speech) may only be prohibited if it causes a substantial and material disruption of the school's operation. These distinctions are well described in *Chandler v. McMinnville School Dist.*, 978 F.2d 524 (9th Cir.1992). In that case, the Ninth Circuit held that schools can suppress vulgar, lewd, obscene or plainly offensive language without a showing of school sponsorship or the threat of substantial interference with the schools work. *Id.* at 529.

It is undisputed that none of plaintiffs' T-shirts was school-sponsored or otherwise bore the imprimatur of the school. *Hazelwood*, therefore, does not apply. Message T-shirts generally fit either within the *Tinker* category of "school-tolerated" expression or, depending on the metaphor or language used, within the *Fraser* category. The court's task, then, is to apply the Supreme Court cases to the slogans at issue here and to the code itself.

■ Before turning to the constitutional analysis, however, it is necessary to eliminate one red herring from the discussion: the impact of a Massachusetts statute on the expressive rights of the high school students.

## B. Effect of Mass.Gen.L. ch. 71, § 82

Mass.Gen.L. ch. 71, § 82 provides:

> The rights of students to freedom of expression in the public schools of the commonwealth shall not be abridged, provided that such right shall not cause any disruption or disorder within the school. Freedom of expression shall include without limitation, the rights and responsibilities of students, collectively and individually, (a) to express their views through speech and symbols, (b) to write, publish and disseminate their views, (c) to assemble peaceably on school property for the purpose of expressing their opinions....
>
> No expression made by students in the exercise of such rights shall be deemed to

be an expression of school policy and no school officials shall be held responsible in any civil or criminal action for any expression made or published by the students.

Prior to 1988, section 82 was a "local options statute" and applied only to towns that affirmatively adopted it. However, in 1988, the Legislature passed a bill, sponsored by Representative Paleologos, rendering § 82 *mandatory* for all cities and towns. Plaintiffs argue this extension of state law was prompted by the *Fraser* and *Hazelwood* decisions and was intended to increase protection for student speech. According to plaintiffs, under Massachusetts law South Hadley is now *only* permitted to prohibit student speech that substantially and materially disrupts the basic educational mission of the schools. Plaintiffs contend that due to this statute no expression, however lewd or vulgar, can be prohibited in a high school in Massachusetts, without a showing of a substantial potential for disruption.

This aggressive interpretation of Mass. Gen.L. ch. 71, § 82 is offered without the support of a single reported decision construing the statute. Federal courts have been repeatedly admonished not to blaze "new and unprecedented trails" in state jurisprudence. *Kotler v. American Tobacco Co.*, 926 F.2d 1217, 1224 (1st Cir.1990). Moreover, the statute itself and its sparse legislative history confirm that the law was aimed at *Hazelwood* and not at *Fraser*.

Both parties have submitted a press release by Representative Paleologos entitled "Representative Paleologos Files Bill To Promote Students Right To Free Expression." [7]

The press report made clear that the intent of the Paleologos' bill was to remove the distinction, made in *Hazelwood*, between school-sponsored and school-tolerated speech. It focused upon the power of school officials to censor "school newspapers, plays and other 'school-sponsored' activities." The statute freed school officials from concern about liability for student writings they might have been perceived as sponsoring.

No evidence suggests that either § 82, or the Paleologos bill making it mandatory, intended to take from the hands of school officials all power to limit non-disruptive, lewd or vulgar speech within the Commonwealth's secondary schools.

Contrary to plaintiff's argument, the *Fraser* holding does not depend on the fact that Matthew Fraser's speech was given at a school-sponsored event. The Court reasoned that the

> ... First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic educational mission. A high school assembly *or classroom* is no place for a sexually explicit monologue directed towards an unsuspecting audience of teenage students. Accordingly, it was perfectly appropriate for the school to dissociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the "fundamental values" of public school education.

*Id.*, 478 U.S. at 685–86, 106 S.Ct. at 3165–66 (emphasis added).[8] While it is true that the

---

**7.** The press release describes the *Hazelwood* decision as follows:

> Last week the Supreme Court ruled in a 5–3 decision that public school officials have broad power to censor school newspapers, plays and other "school-sponsored expressive activities." The bill would protect the rights of students to create and disseminate their uncensored views in a student sponsored and student controlled forum.
>
> Paleologos, a former high school journalist and now House Chairman of the Legislature's Committee on Education, said, "We can't expect our kids to learn to think critically, if we muzzle them whenever they try and do so. Last week's Supreme Court decision [*Hazelwood*] put student newspapers into the princi-

pal's paper shredder." He continued, "In our state the message to students should be that though we may disagree with their views and opinions, we value their right to express themselves."

**8.** Two pages earlier Chief Justice Burger wrote as follows:

> Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. Indeed, the "fundamental values necessary to the maintenance of a democratic political system" disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression

"school sponsored/school tolerated" paradigm can be dimly perceived in embryo in *Fraser,* the holding clearly focuses chiefly upon the lewd or indecent nature of the speech and not on the fact that the speech was school-sponsored.[9]

To summarize, section 82 requires that "school-sponsored" speech, such as articles in student-run newspapers, are to be judged by the same standard as "school tolerated" speech. Thus, school officials will not find themselves on the rack for students articles. Section 82 has no relevance, however, to the analysis of a school administrator's efforts to curb vulgarity and sexual innuendo. This statute does not affect *Fraser*'s central holding. The court must apply a constitutional, not a state statutory, analysis.

The court will now turn to the two sections of the dress code challenged by the plaintiffs.

### C. Clothing That is "Obscene, Profane, Vulgar or Lewd"

█ Plaintiffs contend that this provision of the dress code is unconstitutional because, before prohibiting speech as "vulgar", the school must establish that the message causes a *substantial* interference with the school's operation. Since school officials have not shown this, plaintiffs' argue, the court must find, first, that their action in prohibiting the T-shirts was unconstitutional

and, second, that enforcement of this provision of the code must be enjoined.

As discussed above, the Supreme Court has ruled that schools are entitled to prohibit speech that is expressed in lewd, vulgar, or offensive terms, *regardless* of whether the speech causes a substantial disruption. *See Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 683, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986).

It is significant to note that, in enforcing this section of the code, defendants have not attempted to prohibit T-shirts based on the actual viewpoint expressed in the message, as in *Tinker.* No party has argued that in banning the "See Dick Drink" T-shirt school officials were attempting to repress the message that students should not drink and drive, or were trying to deter students from joining the band by prohibiting the "Do It to the Rhythm" shirt. Moreover, although plaintiffs attempt to characterize defendants' action as an effort to squelch a protest against censorship, the evidence is to the contrary: T-shirts expressing opposition to censorship in various ways, some very whimsical and effective, *were* permitted. Only T-shirts that school officials considered vulgar were banned. Unlike *Tinker,* this is not a case about whether a particular viewpoint may be expressed. Rather, the prohibition targets the *manner* in which views are presented.[10]

---

are inappropriate and subject to sanctions. The inculcation of these values is truly "the work of the schools." *Tinker v. Des Moines School Dist.,* 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (further citations omitted). The determination of what manner of speech in the classroom or in the school assembly is inappropriate properly rests with the school board.

*Id.,* 478 U.S. at 683, 106 S.Ct. at 3164.

**9.** In a footnote, the Court in *Hazelwood* explained the difference between *Tinker* and *Fraser.* It noted that the *Fraser* decision "rested on the 'vulgar,' 'lewd,' and 'plainly offensive' character of a speech delivered at an official school assembly" rather than on any propensity of the speech to materially disrupt classwork. *Id.* 484 U.S. at 271–72 n. 4, 108 S.Ct. at 570–71 n. 4.

In his dissenting opinion, Justice Stevens seemed to recognize as much when he stated the following:

"Frankly, my dear, I don't give a damn." When I was a high school student, the use of those words in a public forum shocked the Nation. Today Clark Gable's four-letter expletive is less than it was then. Nevertheless, I assume that high school administrators may prohibit the use of that word in the classroom discussion and even in extracurricular activities that are sponsored by the school and held on school premises.

*Id.,* 478 U.S. at 691, 106 S.Ct. at 3168 (Stevens, J. dissenting).

**10.** In making this observation this court is not suggesting that the words chosen to express a message are not sometimes entitled to First Amendment protection. As Justice Harlan observed in *Cohen,* "one man's vulgarity is another's lyric" and "words are often chosen as much for their emotive as their cognitive effect." 403 U.S. at 25–26, 91 S.Ct. at 1788–89. Nevertheless, given the school setting, it is noteworthy that no effort was made here to limit viewpoint.

The facts in *Broussard v. School Board of City of Norfolk,* 801 F.Supp. 1526 (E.D.Va. 1992), are analogous to this case. In *Broussard,* plaintiff Kimberly Broussard, a twelve-year-old student attending the seventh grade, bought a concert T-shirt of the music group NKOTB (New Kids on the Block). The front of the shirt carried the words "Drugs Suck" in black and white letters about eight inches in height. The back of the shirt contained the name of the band and its leader, Donnie Wahlberg.

Kimberly wore the T-shirt to her seventh grade class at Blair Middle School, which was attended by approximately 1200 students, ranging in age from eleven to fifteen years old. School officials informed Kimberly that the T-shirt violated the dress code because the word "suck" was offensive. They requested that she change into another shirt or turn her shirt inside out. When Kimberly declined, the school imposed a one-day suspension.

Kimberly, through her parents, filed suit in federal district court claiming that the school officials violated her First Amendment rights. The district court stated that this was not a content based restriction on speech but rather concerned only the "authority of school officials to regulate language displayed on clothing that they reasonably regard as inappropriate and offensive." *Id.* at 1534. The district court reasoned that speech need not be sexual for schools officials to prohibit it; "speech that is merely lewd, indecent, or is offensive is subject to limitation." *Id.* at 1536.

Plaintiffs, through the use of etymology experts, attempted to persuade the court that the word "suck" in Kimberly's "Drugs Suck" T-shirt did not convey a sexual or offensive message but was commonly understood by students to mean that "drugs are bad." *Id.* at 1533. The court, demonstrating deference to the school board, determined that the word "suck" could *reasonably* be considered offensive and concluded that

school officials acted properly in prohibiting the T-shirt and disciplining the student.

Other courts have endorsed the same position. For example, in *Chandler v. McMinnville School Dist.,* 978 F.2d 524 (9th Cir. 1992), the Ninth Circuit held that school officials "may suppress speech that is vulgar, lewd, obscene, or plainly offensive without a showing that such speech occurred during a school-sponsored event or threatened to 'substantially interfere with [the school's] work.'" *Id.* at 529 (citations omitted).

Similarly, in *Gano v. School Dist.,* 674 F.Supp. 796 (D.Idaho 1987), the district court, denying a student's motion for preliminary injunction, held that a T-shirt containing a caricature of three school administrators drinking alcohol and acting drunk was "clearly offensive" and need not be tolerated by school officials. *Id.* at 798. *See also Doe v. University of Michigan,* 721 F.Supp. 852, 863 (E.D.Mich.1989), ("speech which is 'vulgar,' 'offensive,' and 'shocking' is not entitled to absolute constitutional protection in all circum-stances." (citations omitted)). Significantly, plaintiffs have not offered a single authority anywhere in the country holding that the First Amendment prohibits school officials from restricting non-disruptive, vulgar speech by students.

Plaintiffs maintain that the "See Dick" T-shirt expresses a political message and should therefore be given absolute protection. The Supreme Court has made clear, however, that the expressive rights of students are not coextensive with adults and must be "applied in light of the special characteristics of the school environment." *Hazelwood School District v. Kuhlmeier,* 484 U.S. at 266, 108 S.Ct. at 567 (citations omitted).[11] At least in high school, a political message does not justify a vulgar medium.

Jeffrey's "Coed Naked Band" T-shirt offers an excellent example of the inappropriateness of setting up a federal judge to second guess school administrators' decisions regarding student messages containing sexu-

---

**11.** Judge Newman succinctly expressed this point when he stated "the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket." *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. at 682–83, 106 S.Ct. at 3164–65 (quoting *Thomas v. Board of Education, Granville Central School Dist.,* 607 F.2d 1043, 1057 (2nd Cir.1979) (Newman, J., concurring)).

al innuendo. After some struggle, the defendants determined that not all Coed Naked T-shirts should be prohibited. For example, Jonathan's contrived "Coed Naked Gerbils" and "Coed Naked Censorship" T-shirts were permitted. Only Coed Naked T-shirts that displayed an overt sexual tag line were deemed off limits. Other T-shirts in the "Coed Naked" line arguably go further. For example:

1. "Coed Naked Law Enforcement: Up Against the Wall and Spread 'Em."

2. "Coed Naked Gambling: Lay Them on the Table."

3. "Coed Naked Auto–Racing: Lapping the Competition."

4. "Coed Naked Firefighters: Find 'Em Hot, Leave 'Em Wet."

5. "Coed Naked Lacrosse: Ruff and Tuff and in the Buff."

6. "Coed Naked Billiards: Get Felt on the Table."

The defendants here decided to draw the line somewhere between "Button Your Fly" and "Do It to the Rhythm." Other lines are easy to conceive, perhaps between "Do It to the Rhythm" and "Up Against the Wall and Spread 'Em" or perhaps somewhere else. But, unless federal courts are to take on the task of assessing, each morning of the school year, the latest creations of the adolescent imagination—or rather the latest mass-produced products of the commercial exploiters of the adolescent imagination—the limits on vulgarity in secondary schools, assuming a general standard of reasonableness, are to be defined by school administrators, answerable to school boards and ultimately to the voters of a community. "Local control over the public schools, after all, is one of this nation's most deeply rooted and cherished traditions." *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir.1989).

It is important to emphasize that this latitude, while broad, is not without boundaries. No one could argue, for example, that wearing a black armband is "vulgar." There is no evidence that, in South Hadley, the prohibition is used as a pretext. In fact, the testimony reveals that students over the past five years have rarely been asked to change T-

shirts. In the end, through the whole well orchestrated controversy in the 1992–93 school year, only two T-shirts were forbidden. Testimony revealed that *no* T-shirts were banned in the 1993–94 school year. Students, school administrators and teachers simply have more important things to do.

Moreover, reasonable limitations on vulgarity *do* facilitate a school's educational mission. Aside from the lessons in civility noted by the Supreme Court, testimony suggested that many students in South Hadley welcomed relief from an environment of unrelieved winks, snickering and sexual prodding. It becomes banal and distracting constantly to be exhorted to "do it." While plaintiffs' expert testified that the T-shirts in question here did not constitute, in her view, sexual "harassment" *per se*, she did agree that a substantial number of students, perhaps younger or less sophisticated, would find it hard to bring complaints to teachers or school administrators about a sexually-charged atmosphere that interfered with their ability to study, or sexual innuendo that made them uncomfortable.

In sum, on the question of when the pungency of sexual foolery becomes unacceptable, the school board of South Hadley is in the best position to weigh the strengths and vulnerabilities of the town's 785 high school students. The First Amendment does not compel the court into this arena. The plaintiffs' motion seeking an order lifting the school's prohibition of the two T-shirts, and requesting an injunction against the enforcement of the dress code provision against "obscene, profane, lewd or vulgar" apparel will be denied.

D. *Clothing that "harasses, intimidates, or demeans an individual or group of individuals because of sex, color, race, religion, handicap, national origin or sexual orientation"*

As has been repeatedly noted, schools have the right to prohibit speech that causes a substantial disruption to the educational process. *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 509, 89 S.Ct. 733, 738, 21 L.Ed.2d 731 (1969). In making this ruling, however, the Court warned that to justify silencing

student speech the school must show more than just a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509, 89 S.Ct. at 738. The Constitution forbids a school from prohibiting expression of opinion merely "because of an undifferentiated fear or apprehension of disturbance." *Id.* at 508, 89 S.Ct. at 737. It follows that while a school can bar a T-shirt that causes a material disruption, it cannot prohibit one that merely advocates a particular point of view and arouses the hostility of a person with an opposite opinion.

> In our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Id.* at 508–09, 89 S.Ct. at 737–38 (internal citations omitted).

 It is impossible to avoid the conclusion that the "harassment" provision of the South Hadley dress code is aimed directly at the content of speech, not at its potential for disruption or its vulgarity. In *R.A.V. v. City of St. Paul,* —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), the Supreme Court addressed the constitutionality of a city hate speech ordinance.[12] In holding that the ordinance was unconstitutional viewpoint discrimination, the Court explained as follows.

**12.** The St. Paul ordinance provided:

Whoever places on public or private property a symbol, object, appellation, characterization, or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others

In its practical operation, moreover, the ordinance goes even beyond mere content discrimination, to actual viewpoint discrimination. Displays containing some words—odious racial epithets, for example—would be prohibited to proponents of all views. But "fighting words" that do not themselves invoke race, color, creed, religion, or gender—aspersions upon a person's mother, for example—would seemingly be usable *ad libitum* in the placards of those arguing *in favor* of racial, color, etc. tolerance and equality, but could not be used by that speaker's opponents. One could hold up a sign saying, for example, that all "anti-Catholic bigots" are misbegotten; but not that all "papists" are, for that would insult and provoke violence "on the basis of religion." St. Paul has no such authority to license one side of a debate to freestyle, while requiring the other to follow Marquis of Queensbury Rules.

The Court went on to note that "[t]he point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of content."

In another case, *Iota XI Chapter of Sigma Chi Fraternity v. George Mason Univ.,* 993 F.2d 386 (4th Cir.1993), the University punished a local fraternity because it conducted an "ugly woman contest" that contained racist and sexist overtones. The fraternity brought suit claiming that imposition of the sanctions violated the First Amendment. The Court of Appeals for the Fourth Circuit affirmed the district court's grant of summary judgment in favor of the fraternity. According to the Court of Appeals, the University punished the message conveyed by the "ugly woman contest" because it "ran counter to the views the University sought to communicate to its students and the community." *Id.* at 393. The University's decision to punish this type of speech was problematic because

on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.

Petitioner and a few other teenage boys were charged with violating this ordinance when they burned a cross inside the yard of a black family that lived in the petitioner's neighborhood.

the mischief was the University's punishment of those who scoffed at its goals of racial integration and gender neutrality, while permitting, even encouraging, conduct that would further the viewpoint. expressed by a majority of society as well. "The First Amendment generally prevents government from proscribing . . . expressive conduct because of disapproval of the ideas expressed."

*Id.* at 393, quoting *R.A.V. v. City of St. Paul,* — U.S. —, —, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). (Further citations omitted). While recognizing the University's substantial interest in maintaining an educational environment free of racism and sexism, the Court of Appeals explained that the University's conduct "cannot consist of selective limitations upon speech." *Id.* (citation omitted).

Similarly, a University policy prohibiting the use of symbols, epithets or slogans that carry negative connotations about a person's race or ethnicity was found to violate the First Amendment in *Dambrot v. Central Mich. University,* 839 F.Supp. 477 (1993). In that case, the University prohibited negative, but allowed positive, racial connotations.

A campus speaker may thus go on at length recounting what he supposes to be the ethnic attributes of, for example, the Irish. So long as he speaks in a way which appears, from the viewpoint of the university's enforcers, to be either positive or neutral, the speaker is on safe ground so far as university policy is concerned. That speaker's tally of ethnic attributes, though, would be the *only* viewpoint allowed to be heard on the CMU campus, because all speakers with a differing view on that issue are prohibited by the policy from responding: in *their* words the speech police can "infer *negative* connotations about an individual's . . . ethnic affiliation" or something "hostile" on those ethnic grounds. One can, of course, remove "Irish" and substitute the "ethnic or racial affiliation" of one's choice in this example.

*Id.* at 483. The court concluded that the University's policy regarding the expression of speech "is as remarkable as it is illegal." *Id.* at 484.

The Supreme Court has acknowledged the generous discretion given to local boards in operating public schools. *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987). Clearly, secondary school officials have great latitude to regulate speech based on the school environment and the varying maturity levels of its students.

Nevertheless, as *Tinker* holds, the school's authority is not absolute. Despite students' more limited First Amendment rights in a school setting, South Hadley cannot silence non-vulgar, non-disruptive speech simply based upon the viewpoint expressed. Unfortunately, the "harassment" provision of the dress code does just that.

Justice Jackson, in a compulsory flag salute case, put the matter concisely.

The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. . . . That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

*West Virginia State Bd. of Education v. Barnette* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).

The risk of repression raised by this provision is not hypothetical. The plaintiffs' T-shirts were, at first, prohibited partly on the questionable ground that they "harassed" female students. Trial testimony revealed, for example, that Jeffrey Pyle wore, without incident, a T-shirt displaying two men in naval uniform kissing. A T-shirt carrying a depiction objecting to homosexuality, on the other hand, would be flatly forbidden by the code because it "demeaned" a person based on his or her sexual orientation. South Hadley's desire to teach students tolerance of persons with a different religion, race, gender, or sexual orientation is certainly admirable. However, the school cannot silence speech that runs contrary to this laudable goal.

Under the current code, if a student wore a T-shirt to South Hadley High School containing a message expressing antipathy towards, or for that matter sympathy with, a particular group, the school could still ban that T-shirt, if it reasonably concluded that the message would cause a substantial and material disruption to the daily operations of the school. *Tinker* allows the school to do this. But the school cannot pick and choose; it may not prohibit antipathetic slogans but allow positive ones. The "constitutional line is crossed when, instead of merely teaching, the educators demand that students express agreement with the educator's values." *Steirer v. Bethlehem Area School Dist.,* 987 F.2d 989, 994 (3rd Cir.1993). Since the "harassment" section of the defendant's dress code overlaps this constitutional boundary, the court will allow this portion of the plaintiffs' motion for injunctive relief.

### E. *Arbitrary and Capricious Enforcement of the Dress Code*

█ Finally, plaintiffs assert that the dress code has been enforced in an arbitrary and inconsistent manner and that as a result they have no adequate notice as to which T-shirts are permissible. Plaintiffs claim that the dress code has been used by the school administration to ban any messages which it finds personally offensive. Plaintiffs offer as evidence of capriciousness several occasions when school officials backtracked or delayed in rendering decisions on particular shirts.

The facts of record and trial testimony reveal the contrary. The occasional delay or inconsistency was minimal and caused by a combination of cleverness by plaintiffs and some cumbersomeness in the administration's attempts to respond. There was no evidence of bad faith. At trial Kimball testified that while he found many of the students' T-shirts personally offensive, he allowed them because they did not violate the dress code. His May 18, 1993 memo to the faculty informed the teachers of the same: not all T-shirts that the teachers found offensive would be deemed to violate the dress code. In order to enforce the dress code in a consistent manner and avoid a situation in which one particular administrator's views

about the dress code dominated, the school developed a policy of review by three administrators. In sum, with some understandable awkwardness, the dress code was enforced reasonably, and in good faith.

It is not surprising that the school officials had some initial difficulty applying the dress code to the plaintiff's T-shirts. Many "experts" and scholars of the First Amendment disagree over the very issue before the court. In fact, the record amply supports the conclusion that the defendants' confusion was fueled, to some extent, by plaintiffs' attempt to expose the gray areas of the dress code and challenge its boundaries. After a rocky first few days, enforcement of the dress code became routine. Two T-shirts were banned in 1992–93, none in 1993–94.

In sum, the facts do not support the conclusion that the school's enforcement of the dress code was arbitrary and capricious.

### IV. CONCLUSION

This is a tale "without heroes and without villains." *Poling v. Murphy* 872 F.2d 757, 761 (6th Cir.1989). It is impossible to conclude without a sense of respect, and sympathy, both for the plaintiffs, who have so ardently defended their right to free expression, and for the defendants, who have strived to recognize these rights and harmonize them with the rights of others in a turbulent school setting. These teacup-sized tempests are the workaday world of our Bill of Rights. It would be ominous indeed if the friction between individual rights and responsible authority were ever completely to end.

No evidence appears, however, to suggest that this tension will stop. Emily Dickinson, perhaps the greatest and most original of American poets, lived in South Hadley in the school year of 1847–48 while attending Mount Holyoke College, then known as Mt. Holyoke Seminary. On February 17, 1848, at age 17, she wrote to her brother Austin describing the school administration's attitude towards the recent holiday.

Monday afternoon Mistress Lyon [Mary Lyon (1797–1849), founder and principal of the Seminary] arose in the hall & forbade our sending "any of those foolish notes

called Valentines." But those who were here last year, knowing her opinions, were sufficiently cunning to write & give them into the care of Dickinson [no relation to Emily], during the vacation, so that about 150 were despatched on Valentine morn, before orders should be put down to the contrary effect. Hearing of this act, Miss Whitman by & with the advice & consent of the other teachers, with frowning brow, sallied over to the Post Office, to ascertain if possible, the number of Valentines and worse still, the names of the offenders. Nothing has yet been heard as to the amount of her information, but as Dickinson is a good hand to help the girls & no one has yet received sentence, we begin to think her mission unsuccessful.

*The Letters of Emily Dickinson,* Vol. I, at 63. (Thomas H. Johnson, ed., The Belknap Press of Harvard University Press, 1958).

To conclude, for the reasons set forth above the court will order entry of partial judgment for the plaintiffs with regard to their claim for injunctive relief against section e. 2. of the South Hadley dress code, and will order entry of judgment for the defendants on all other claims. A separate order will issue.

The clerk will enter partial judgment for plaintiffs on their demand for injunctive relief against Section e. 2. of the current dress code. Defendants are hereby enjoined from enforcing this section of the code, except to the extent that the clothing worn substantially interferes with the work of the school or impinges upon the rights of other students. In all other respects the clerk will enter judgment for defendants.